**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**MONICA A. D.,**

                                        **Plaintiff,**

            **vs.**                                        **1:18-cv-660**
                                                           **(MAD)**

**NANCY A. BERRYHILL,**
*Acting Commissioner of Social Security*,

                                        **Defendant.**

_____

**APPEARANCES:**                        **OF COUNSEL:**

**BUCKLEY MENDLESON CRISCIONE**          **STEPHEN J. MASTAITIS, JR.**, **ESQ.**
**& QUINN PC**
29 Wards Lane
Albany, New York 12204
Attorneys for Plaintiff

**SOCIAL SECURITY ADMINISTRATION**       **DAVID L. BROWN, ESQ.**
Office of Regional General Counsel - Region II
26 Federal Plaza, Room 3904
New York, New York 10278
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

            On February 22, 2016, Plaintiff filed an application for disability insurance benefits

("DIB"), alleging disability beginning December 31, 2012.[1]  *See* Administrative Record ("R.") at

144-50.  Administrative Law Judge ("ALJ") John Farrell conducted a hearing on September 25,

2017, and, on December 6, 2017, issued a decision holding that Plaintiff was not disabled.  *See id.*

_____

            [1] Plaintiff later amended the disability onset date to November 19, 2014.  *See* Dkt. No. 15
at 3.

at 23-65.  On April 13, 2018, the Social Security Administration ("SSA") Appeals Council denied Plaintiff's request for review.  *See id.* at 5-8.

Plaintiff has appealed the SSA's decision to this Court.  *See* Dkt. No. 1 at 1.  For the following reasons, Plaintiff's appeal is denied.

## II. BACKGROUND

### A.    Plaintiff's Medical History

#### *1. Scoliosis*

Plaintiff has severe adult scoliosis, for which she regularly visits with Dr. Todd Shatynski of Capital Region Orthopaedics.  *See* R. at 269 (noting, on November 19, 2014, that Plaintiff "has a benign exam with range of motion in her cervical, thoracic and lumbar spine" despite "obvious [thoracolumbar] scoliosis, significant thoracic kyphosis, and anterior head carriage with a left hemithoracic elevation of the lower left aspect of her posterior spine"); *id.* at 252 (reporting, on March 2, 2015, that Plaintiff was "quite upset and emotional" and had "some neck pain," but that she was "neurologically intact in the lower extremities with strength, sensation, and reflexes"); *id.* at 253 (reporting, on June 1, 2015, that Plaintiff was an "alert, well-appearing, very apprehensive but pleasant woman in no acute distress" with "significant sensitivity" in her back from scoliosis).

Dr. Shatynski referred Plaintiff to Dr. James Lawrence of Capital Region Spine for a surgical opinion about her scoliosis.  *See id.* at 269.  At an initial consultation on February 24, 2015, Dr. Lawrence observed Plaintiff's "massive thoracolumbar scoliosis with coronal and sagittal malalignment" and ordered an MRI "to see about localization for the possibility of pain management."  *See id.* at 257-59.  On April 7, 2015, Dr. Lawrence followed up that he did not see anything to suggest "any spinal cord level impairment and pathology," and he suggested that

Plaintiff consider an epidural to help with her pain. *See id.* at 261. There is no evidence that Plaintiff ever had the epidural. *See id.* at 260, 271.

Although Plaintiff's scoliosis was severe, it was not progressive. *See id.* at 288 (x-ray report showing that Plaintiff had "marked thoracolumbar S-shaped scoliosis" with mild degenerative changes); *id.* at 329 (Dr. Lawrence reporting, on May 18, 2016, that Plaintiff "still has tremendous back pain, neck pain with low back pain, and is generally miserable from all of it," but that "the likelihood of progression here is minimal"); *id.* at 322 (Dr. Lawrence reporting, on August 17, 2016, that Plaintiff "has no progressive deterioration or worsening of the scoliosis or the rotation in the thoracic region or the kyphosis"). Accordingly, Plaintiff was treated conservatively for her scoliosis. *See, e.g.*, *id.* at 270 (Dr. Shatynski recommending "conservative management in terms of weight loss, exercise, anti-inflammatory use, and muscle relaxant to aid in relaxation and sleep," and physical therapy); *id.* at 260, 271 (Plaintiff deciding, on July 7, 2015, to treat her scoliosis conservatively); *id.* at 330 (Dr. Shatynski recommending, on May 16, 2016, that all Plaintiff could do was "keep[] it moving"); *id.* at 322 (Dr. Lawrence recommending, on August 17, 2016, muscle exercises and physical therapy).

By November 22, 2016, Dr. Shatynski reassured Plaintiff that "there is nothing further to follow [up with]" regarding her knee or back issues and "the best that she can do is try to keep exercising and keep moving and trying to do her therapy exercises on her own." *See id.* at 318. That conclusion was confirmed by Dr. Lawrence on May 17, 2017, when he reported that he saw "no indication for any aggressive surgical involvement in the spine at this time." *See id.* at 317.

### 2. Plaintiff's Knee Surgery

On December 22, 2015, Plaintiff underwent knee surgery performed by Dr. Michael A. Flaherty of Capital Region Ambulatory Surgery Center to repair a "[r]ight comminuted patella

fracture." *See id.* at 277-79.  According to Dr. Flaherty's notes, Plaintiff recovered well from her surgery.  *See id.* at 276 (eight days after surgery, Plaintiff was tolerating weightbearing in her knee immobilizer and was going to start physical therapy); *id.* at 275 (six weeks after surgery, Plaintiff had "[c]ontinue[d] range of motion and PT"); *id.* at 295, 331 (on April 20, 2016, Plaintiff "ha[d] full extension" of her right knee, could "ambulate[] with a walker and a cane," and was cleared "to be out of the brace with full range of motion" but needed to continue physical therapy); *id.* at 325 (on June 1, 2016, Plaintiff had full extension of her right knee, flexion to 120 degrees, and good range of motion); *id.* at 334 (reporting, on June 21, 2017, that "[t]he fracture is now healed").

Although Plaintiff's knee continued to heal, she had some issues with the hardware used to repair the fracture.  *See id.* at 294 (complaining, on March 9, 2016, of "some prominence of the hardware anteriorly"); *id.* at 327 (discussing, on May 26, 2016, hardware removal); *id.* at 324 (indicating, on August 3, 2016, that Plaintiff still had "complaints about the hardware"); *id.* at 321 (indicating, on September 23, 2016, that Plaintiff "has been doing reasonably well" and "has been walking," but that she "continues to be fixated on some wires and bumps coming out of her knee"); *id.* at 320 (discussing in detail, on November 2, 2016, removal of the hardware); *id.* at 316 (noting, on May 24, 2017, that Plaintiff was "contemplating hardware removal"); *id.* at 334 (noting, on June 21, 2017, that Plaintiff "ambulates comfortably," but still wants the hardware removed).  Eventually, in late 2017, Plaintiff had the hardware removed.  *See id.* at 415.

### 3. Anxiety and Depression

Dr. Shatynski noted on several occasions that Plaintiff's pain was exacerbated by her depression and anxiety.  *See id.* at 253 (reporting that "the anxiety [Plaintiff] suffers with is certainly complicating matters"); *id.* at 254 (stating that "her depression and anxiety are putting

up barriers for any kind of treatment for her"); *id.* at 255 (noting that Plaintiff's "depression and anxiety with medical treatment is certainly complicating matters"); *id.* at 330 (noting that Plaintiff was "emotional, and anxious" but that he "tried to reassure her at length" that her knee had "healed quite well"). Plaintiff's husband passed away unexpectedly in November 2015, which Plaintiff alleges has contributed to her depression. *See id.* at 45; Dkt. No. 11 at 5. Additionally, Dr. Flaherty noted that Plaintiff's knee recovery was hindered, in part, by her "social issues." *See* R. at 294 (reporting, two and a half months after surgery, that "[m]ost of her issues throughout have been social related to her ability to get around in a safe manner"); *id.* at 325 (noting on June 1, 2016 that Plaintiff "has significant social issues with care after surgery").

Plaintiff has not seen a doctor for any mental conditions, nor has she been diagnosed with anxiety, depression, or any other mental illness. *See id.* at 180.

### 4. Osteoporosis

Plaintiff was diagnosed with osteoporosis by Dr. Steven P. Smith on February 23, 2017. *See id.* at 302-07. On March 8, 2017, Dr. Shimon Tobolsky of the Endocrine Group at Albany Med Faculty Physicians examined Plaintiff for her osteoporosis and to follow up on "her thyroid status." *See id.* at 310-13. Dr. Tobolsky concluded that Plaintiff had osteoporosis in her wrist, but had a normally functioning thyroid, and did not recommend any medication changes. *See id.* Plaintiff followed up with Dr. Tobolsky on March 22, 2017, May 23, 2017, July 5, 2017, and August 18, 2017, but he never found a thyroid issue or secondary cause for the osteoporosis. *See id.* at 451-66.

### 5. Other Medical Evidence

Plaintiff's medical records also indicate that she had an MRI in April 2011 for a tear in her finger, *see id.* at 268, and that she had elevated blood pressure on April 19, 2016, *see id.* at 289.

Additionally, a few of the records mention that Plaintiff has a history of gastroesophageal reflux disease ("GERD"). *See id.* at 269, 284. Finally, during her disability examination, Plaintiff reported that she suffers from daily headaches, which "decrease with medication." *See id.* at 284.

**B.     Plaintiff's Non-Medical History**

Plaintiff worked as an administrative assistant in the personal injury claims department of an insurance agency from May 1981 to December 2012, when she was terminated. *See id.* at 48, 169, 194-95. Each day at that job, Plaintiff spent one and a half hours walking and standing, five hours sitting, and six hours reaching, writing, typing, or handling small objects. *See id.* at 179, 195. That job did not require any stooping, kneeling, crouching, crawling, or handling large objects, although Plaintiff frequently lifted files, which weighted up to five or ten pounds. *See id.*

In a function report dated April 6, 2016, Plaintiff reports that she can wash herself, brush her teeth, dress herself, and exercise her knee, although "all of this takes a while because of my back and neck pain and knee pain." *See id.* at 183. Plaintiff can sit for about one to one and a half hours before needing to get up and move because of pain, but can read and watch television as long as she moves around every hour or so. *See id.* at 184-87. Plaintiff reportedly ices her knee, uses a heating pad on her back, and lays down for much of the day. *See id.* at 183-84, 191-92. At night, Plaintiff is awoken by pain every one to two hours, and sometimes sleeps in a recliner. *See id.* Additionally, Plaintiff uses a walker, which intensifies her back and neck pain. *See id.* at 184.

As for personal care, Plaintiff reports that a torn tendon in her finger makes it difficult for her to get dressed, fix her hair, and write. *See id.* Plaintiff also needs help getting into the shower and doing laundry. *See id.* at 184-86. Plaintiff prepares easy meals for herself daily, such as sandwiches or frozen food, but cannot do any household chores or shopping. *See id.* at 185-87.

6

Plaintiff claims that she usually does not go outside because she is worried about falling and needs to use the walker. *See id.* Plaintiff drives herself to physical therapy and doctor appointments, but claims that she needs assistance to go anywhere else. *See id.* Her ability to handle money has not changed since her injuries. *See id.*

## C.    Disability Application

On February 22, 2016, Plaintiff filed a Title II application for a period of disability and DIB, alleging that she has been disabled since December 31, 2012. *See id.* at 144-50.

On April 19, 2016, Plaintiff was examined by Dr. Kautilya Puri as part of her disability application. *See id.* at 284-87. Dr. Puri reviewed Plaintiff's history of back and neck pain, right knee cap fracture and pain, GERD, and "torn tendon in the right finger with some local pain." *See id.* at 284. Dr. Puri observed that Plaintiff "[n]eeded no help changing for exam or getting on and off exam table," and "appeared to be in no acute distress," although she had a limp and used a wheelchair for pain and weightbearing. *See id.* at 285. Dr. Puri reported:

> [Plaintiff] did not have any objective limitations to communication or fine motor movements. Mild limitations to gross motor movements of her right knee, post surgery, as above. On a short-term basis, she would have mild limitations to her gait or to her activities of daily living on examination today and marked limitations to squatting, bending, stooping, kneeling, and lifting weights. It is recommended that she be seen by an orthopedic doctor and, on a short-term basis, not walk for long periods of time, secondary to her above history.

*See id.* at 287.

Plaintiff's disability claim was initially denied on May 5, 2016, and on September 25, 2017, Plaintiff had a hearing before ALJ Farrell in Albany, New York. *See id.* at 5-8, 40-65. At the hearing, Plaintiff amended her alleged disability onset date to November 19, 2014. *See id.* at 47. During the hearing, ALJ Farrell questioned Plaintiff about her education and work history,

illnesses, symptoms, and daily life, and a vocational expert ("VE") testified about the physical requirements of Plaintiff's old job. *See id.* at 44-64. The VE based her testimony on her experience as a vocational counselor and career services coordinator, and Plaintiff did not object to her qualifications. *See id.* at 63, 235-36.

On November 30, 2017, ALJ Farrell admitted additional medical evidence into the record, which included Dr. Flaherty's records from the Bone and Joint Center, *see id.* at 406-15, Dr. Lawrence's records from Capital Region Orthopaedics, *see id.* at 419-36, and Dr. Tobolsky's records from The Endocrine Group, *see id.* at 438-70. After considering all of the evidence before him, on December 6, 2017, ALJ Farrell held that Plaintiff was not disabled. *See id.* at 35. Plaintiff appealed to the SSA Appeals Council, who denied her request for review. *See id.* at 5.

**D.      Procedural History**

On June 5, 2018, Plaintiff filed a complaint against the Social Security Commissioner (the "Commissioner") and, on December 24, 2018, she submitted a motion in support of the appeal. *See* Dkt. Nos. 1, 11. Plaintiff argues that (1) the conclusion that she can perform sustained sedentary work, with occasional posturals, is not supported by substantial evidence, (2) the ALJ's failure to fully credit Plaintiff's testimony is error, and (3) the ALJ should have considered Plaintiff's depression, anxiety, and obesity when determining her residual functional capacity ("RFC"). *See* Dkt. No. 11 at 3. On March 22, 2019, the Commissioner filed her response. *See* Dkt. No. 15.

For the following reasons, Plaintiff's appeal is denied.

### III. DISCUSSION

**A.      The ALJ's Decision**

For purposes of DIB, a person is disabled when he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). There is a five-step analysis for evaluating disability claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do." The claimant bears the burden of proof on the first four steps, while the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002)).

After determining that Plaintiff meets the insured status requirements of the Social Security Act, the ALJ applied the above five-step analysis. *See* R. at 28-29. First, the ALJ noted that Plaintiff has not engaged in substantial gainful activity since November 19, 2014, the alleged disability onset date. *See id.* Moving to step two, the ALJ found that Plaintiff has severe impairments, specifically: degenerative disc disease, degenerative joint disease, lumbar degenerative spondylosis, scoliosis, status-post right knee fracture, status-post right knee surgery with hardware, and obesity. *See id.* At the same time, the ALJ found that the arthritis in her hand, GERD, and headaches were nonsevere impairments because they only mildly limit her ability to perform basic work activities and did not last more than twelve months. *See id.*

Continuing to step three, the ALJ considered the Section 1.00 requirements for finding a musculoskeletal system disability (which includes major joint and spine disorders), and held that Plaintiff's impairments "do not reach the level of severity or reveal signs, symptoms or laboratory findings that meet or medically equal any of the impairments listed in Appendix 1."[2] *See id.* at 29.  In reaching this decision, the ALJ "considered the claimant's obesity pursuant to the guidelines in SSR 02-1p." *See id.*

Next, the ALJ concluded that Plaintiff "has the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a) and can occasionally perform all posturals." *See id.*  In so holding, the ALJ found that Plaintiff's impairments could reasonably be expected to produce some of her symptoms, but Plaintiff's statements about the "intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *See id.* at 30.  Despite Plaintiff's obvious, severe scoliosis and related health issues, she has full range of motion of the cervical, thoracic, and lumbar spine with only mild irritability and sensitivity. *See id.*  Additionally, although Plaintiff testified that she cannot lift anything, can only stand for short periods of time, uses a knee brace or a walker to walk, cannot climb stairs, kneel, or squat, and has trouble reaching, her medical records show that she has intact sensations of the lower extremities, normal strength, and a non-antalgic gait. *See id.*  Moreover, Plaintiff reported that she can care for her own personal needs, take her medication, prepare simple meals, drive herself to physical therapy, sit for up to one and a half hours, pay bills, count change, handle a savings account, and manage money. *See id.* at 29-

---

[2] A person whose impairment meets the duration requirement and is listed in Appendix 1 or is equal to a listed impairment is disabled regardless of their age, education, and work experience.  20 C.F.R. § 404.1520(d).  If the impairment is not equivalent to those listed in Appendix 1, the SSA determines that person's RFC based on the case record to ascertain whether that person can do their past relevant work or adjust to other work.  20 C.F.R. § 404.1520(e).

30.  Finally, the ALJ noted that Plaintiff received only conservative treatment for her conditions, such as recommendations of weight loss, exercise, anti-inflammatory medication, muscle relaxers, and physical therapy.  *See id.*

Regarding the opinion evidence in the record, the ALJ assigned significant weight to Dr. Puri's conclusions, which were developed following a full examination of Plaintiff and are consistent with the other medical records.  *See id.* at 33.  On the other hand, the ALJ assigned little weight to Dr. Lammly, because his opinion was "quite conclusory and did not provide any treatment records or explanation of the evidence relied on in forming that opinion."  *See id.*

At step four, the ALJ concluded that Plaintiff is capable of performing her past job as a claims assistant for an insurance company.  *See id.* at 34.  Plaintiff had worked as a claims assistant within the past fifteen years, and worked long enough for her "to learn and perform[] at substantial gainful levels."  *See id.*  The job, as described by Plaintiff, could be performed primarily while sitting, involved one and a half hours of standing and walking each day, and never required Plaintiff to lift more than ten pounds.  *See id.*  Relying on the VE's testimony that such work is semiskilled and performed at the sedentary exertion level, which requires only occasional posturals, the ALJ concluded that Plaintiff's past relevant work accommodated her RFC.  *See id.*

Thus, the ALJ held that Plaintiff "has not been under a disability, as defined in the Social Security Act, from November 19, 2014, through the date of this decision," and denied her request for DIB.  *See id.*

**B.      Analysis**

*1. Standard of Review*

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether a plaintiff is disabled. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court must examine the administrative record to ascertain whether the correct legal standards were applied, and whether the decision is supported by substantial evidence. *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "Substantial evidence" is evidence that amounts to "more than a mere scintilla," and has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation omitted).

When the Commissioner's finding is supported by substantial evidence, it must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982)) (other citations omitted). In other words, the court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Sec'y of Health and Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984).

### 2. *The ALJ Properly Assigned Little Weight to Plaintiff's Statements*

"The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant." *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). The

regulations set out a two-step process for assessing a claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . .  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. . . .  The ALJ must consider "[s]tatements [the Plaintiff] or others make about [her] impairment(s), [her] restrictions, [her] daily activities, [her] efforts to work, or any other relevant statements [she] makes to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quotations and citations omitted).

If a plaintiff's testimony concerning the intensity, persistence, or functional limitations associated with his impairments is not fully supported by clinical evidence, the ALJ must consider additional factors, including the following: (1) daily activities; (2) location, duration, frequency, and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and side effects of any medications taken; (5) other treatment received; and (6) other measures taken to relieve symptoms.  20 C.F.R. § 416.929(c)(3)(i)-(vi).  The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether the plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are credible.  *See* SSR 16-3p, Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, *2 (Soc. Sec. Admin. Oct. 25, 2017).  One strong indication of credibility of an individual's statements is their consistency, both internally and with other information in the record.  *Id.* at *5.

"After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony." *Saxon v. Astrue*, 781 F. Supp. 2d 92, 105 (N.D.N.Y. 2011) (citing, *inter alia*, 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)). An ALJ rejecting subjective testimony "'must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence.'" *Melchior v. Apfel*, 15 F. Supp. 2d 215, 219 (N.D.N.Y. 1998) (quoting *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)) (other citation omitted).

Here, the ALJ considered the Section 416.929(c)(3)(i)-(vi) factors in reaching his conclusion that Plaintiff's statements about the intensity, persistence, and limiting effects of her symptoms were "not substantiated or corroborated by other objective evidence." *See* R. at 30. First, although Plaintiff alleged that she has difficulty sleeping, dressing herself, getting in and out of the shower, and performing household chores, the ALJ properly considered how Plaintiff "did not require any other special help or assistance with caring for her personal needs or with taking medication and [is] able to prepare simple meals." *See id.* at 29-30; *see also id.* at 184-92, 213-17. Regarding her other daily activities, Plaintiff reported that she can drive, pay bills, count change, handle a savings account, manage her money, read, and watch television, although she sometimes needs to get up and move. *See id.* at 29-30, 184-92, 213-17. As for Plaintiff's symptoms, the ALJ noted that she has mild sensitivity over her spine; full range of motion of the cervical, thoracic, and lumbar spine; "intact sensations" in her lower extremities; normal strength; and a non-antalgic gait. *See id.* at 30.

The ALJ's conclusion is supported by substantial evidence, because Plaintiff's statements of pain are fairly inconsistent with her medical records. *See* SSR 16-3p, 2017 WL 5180304, *5.

First, Plaintiff's medical records show that she has been treated conservatively for her scoliosis, and has never had an epidural for pain or surgery to correct her condition. *See* R. at 30-31. Moreover, although Plaintiff's knee fracture required surgery, the records show that her knee was healed, and that Plaintiff was ambulating comfortably, by June 21, 2017. *See id.* at 33. Thus, the ALJ properly explained his reasons for assigning little weight to Plaintiff's complaints about the severity of her pain, and those reasons are supported by substantial evidence in the record. *See* SSR 16-3p, 2017 WL 5180304, *2; *Shaw*, 221 F.3d at 131.

### 3. *The ALJ Assigned the Proper Weight to Dr. Puri's and Dr. Lammly's Opinions*

The treating physician rule states that "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). When an ALJ refuses to assign a treating physician's opinion controlling weight, a number of factors must be considered to determine the appropriate weight to assign, including: (i) the frequency of the examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the SSA's attention that tend to support or contradict the opinion. *See* 20 C.F.R. § 404.1527(c). After accounting for these factors, "the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" *Burgess*, 537 F.3d at 129 (internal quotation marks and citation omitted). "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* at 129-30 (internal quotation marks and citation omitted).

Here, ALJ Farrell comprehensively set forth his reasons for assigning significant weight to Dr. Puri's opinion and little weight to Dr. Lammly's opinion. First, as the ALJ noted, Dr. Puri reached his conclusions after he examined Plaintiff, and his findings "are consistent with other evidence in the record." *See* R. at 33. On the other hand, Dr. Lammly's opinion is nothing more than a checked box in an application for a disability parking permit. *See id.* at 164. That opinion was, as the ALJ noted, "quite conclusory," and was not accompanied by "any treatment records or explanation of the evidence relied on in forming that opinion." *See id.* at 33. In fact, Plaintiff's medical records overwhelmingly contradict Dr. Lammly's opinion that she was "severely limited in her ability to walk due to an arthritic, neurological or orthopedic condition." *Compare id.* at 164 (application for a disability parking permit) *with id.* at 287 (noting a mild limitation to Plaintiff's gait on a short-term basis) *and id.* at 295, 334 (noting that Plaintiff's knee was 80% healed, that she had full extension of her right knee, that she could ambulate comfortably, and that she was cleared "to be out of the brace with full range of motion"). Thus, the Court finds that ALJ Farrell properly applied the Section 404.1527(c) factors in determining how to weigh each physician's opinion evidence, and properly set for "good reasons" for his decision. *See* 20 C.F.R. § 404.1527(c); *Burgess*, 537 F.3d at 129.

### 4. *The ALJ Appropriately Considered Plaintiff's Medically Determinable Physical and Mental Impairment(s)*

Plaintiff argues that "[t]he ALJ erred by not evaluating the effects of symptoms of anxiety, depression, fatigue, headaches, impaired use of the right hand and obesity on the claimant's ability to engage in a full time work at the sedentary level." *See* Dkt. No. 11 at 10. Before the ALJ can consider a claimant's alleged impairments, he must first establish the existence of "a medically determinable physical or mental impairment(s)" - *i.e.*, an impairment(s) that can be shown by

medical signs and laboratory findings - that could reasonably be expected to produce the claimant's pain or other symptoms. *See* SSR 96-7P, Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 2016 WL 1119029, *2 (Soc. Sec. Admin. July 2, 1996). Plaintiff's fatigue, anxiety, and depression were never diagnosed by a medical professional, and thus, it was proper for the ALJ not to consider them in reaching his conclusion. *See id.* Additionally, the ALJ evaluated Plaintiff's headaches and impaired use of her right hand, but determined that such conditions were not severe, a conclusion that is supported by the record. *See* R. at 28-29.

As for Plaintiff's obesity, the Court rejects Plaintiff's assertion that "the ALJ's discussion with regard to the effect of obesity on Ms. Desch is [sic] severe spinal and right knee conditions is virtually nonexistent." *See* Dkt. No. 11 at 9. The ALJ specifically noted that he evaluated Plaintiff's obesity in accordance with SSR 02-1P, which instructs adjudicators that in addition to considering obesity as its own medically determinable impairment, they should consider "the combined effects of obesity with other impairments [which] can be greater than the effects of each of the impairments considered separately." SSR 02-1P, Titles II & XVI: Evaluation of Obesity, 2002 WL 34686281, *1 (Soc. Sec. Admin. Sept. 12, 2002). The ALJ concluded that Plaintiff's obesity was a severe impairment that significantly limits her ability to perform basic work activities, but ultimately found that it was not medically equivalent to a disability listed in Appendix 1. *See id.* at 28. The record clearly supports that conclusion, since Plaintiff's obesity did not severely limit her ability to function in daily life. *See id.* at 183-87 (reporting that she can do physical therapy, exercise her knee, move around when she begins to feel pain from sitting, wash herself, brush her teeth, feed herself, dress herself, prepare simple meals, and drive).

Thus, the Court finds that ALJ Farrell gave the appropriate consideration to each of these impairments.

**5.  *The Decision Applied the Correct Legal Standards and is Supported by Substantial Evidence***

Finally, the Court finds that the ALJ applied the correct legal standards and his conclusion is supported by substantial evidence.  *See Shaw*, 221 F.3d at 131.  First, Plaintiff's work history shows that she has not engaged in substantial gainful work activity since November 19, 2014.  *See* R. at 169-74, 195.  Next, the extensive medical records support the ALJ's conclusion that Plaintiff's degenerative disc and joint disease, lumbar degenerative spondylosis, scoliosis, status-post right knee fracture and surgery with hardware, and obesity are severe impairments that cause her more than minimal functional limitations and have persisted for at least twelve months.  *See, e.g.*, *id.* at 259 (noting "massive thoracolumbar scoliosis with coronal and sagittal malalignment"); *id.* at 269 (noting "obvious scoliosis, significant thoracic kyphosis, and anterior head carriage"); *id.* at 317 (reporting "significant deformity and postural decompensation"); *id.* at 330 (reporting "quite severe" thoracolumbar scoliosis); *id.* at 277-78 (discussing surgery to correct "[r]ight comminuted patella fracture"); *id.* at 415 (discussing hardware removal). Plaintiff's medical records also support the ALJ's conclusion that her arthritis, GERD, and headaches are nonsevere impairments.  *See id.* at 317 (discussing the arthritis in Plaintiff's hands); *id.* at 269, 284 (mentioning Plaintiff's GERD); *id.* at 284 (reporting Plaintiff's headaches).

At the same time, the ALJ properly concluded that Plaintiff's impairments are not as severe as the Appendix 1 impairments.  Section 1.00 of Appendix 1 defines a musculoskeletal system impairment as something that causes an extreme limitation on the ability to walk, which prevents individuals from carrying out activities of daily living.  20 C.F.R. § 404, Subpt. P, App.

18

1 at 1.00(B)(2). Plaintiff's ailments have not prevented her from carrying out the activities of her daily life, as she can still wash herself, brush her teeth, feed herself, dress herself, prepare simple meals, exercise her knee, and drive herself to her doctor appointments and physical therapy. *See* R. at 183-86. Although Plaintiff's knee surgeries temporarily limited her ability to walk, her medical records show that she now "ambulates comfortably" and has good range of motion in her knee. *See id.* at 275-76, 295, 321, 325, 331, 334. Additionally, Plaintiff has received only conservative treatment for her severe spinal issues. *See id.* R. at 257-60, 270-71, 318, 322, 330. Thus, the record clearly supports the ALJ's conclusion that Plaintiff's physical conditions are not as severe as the impairments listed in Appendix 1.

Plaintiff now argues that Dr. Puri found that she was "*markedly* limited" with regard to sitting, standing, walking, squatting, kneeling, climbing, crawling, twisting, bending, stooping, and reaching. *See* Dkt. No. 11 at 8 (emphasis in original). Although Dr. Puri did report that Plaintiff had "marked limitations to squatting, bending, stooping, kneeling, and lifting weights," he noted that those limitations were only "[o]n a short-term basis." *See* R. at 287. Additionally, Dr. Puri found that any limitations on Plaintiff's gait, gross motor movements of her right knee, and activities of daily living were mild and temporary. *See id.* Further, Dr. Puri noted that Plaintiff had a normal stance, "appeared to be in no acute distress," had a "gait limping, favoring the left side," and could "stand on heels and toes," although Plaintiff "says she cannot walk on them." *See id.* at 285. Thus, the Court disagrees with Plaintiff's interpretation of Dr. Puri's report.

Next, the ALJ properly found that Plaintiff has the RFC to perform "the full range of sedentary work as defined in 20 CFR 404.1567(a) and can occasionally perform all posturals." *See id.* at 29. Plaintiff received only conservative treatment for her back and knee pain since the surgery. *See, e.g., id.* at 260, 271. Plaintiff's scoliosis, though severe, is not progressive, and

medical records show that she has full range of motion of the spine with no neurological symptoms. *See id.* at 252, 269-70, 329. Moreover, despite her pain, the records show that Plaintiff can sit for about one to one and a half hours per day, can ambulate with a walker, can drive herself when necessary, and can exercise her knee. See id.. at 183-87. Plaintiff's more severe limitations, such as trouble walking, were determined to be temporary issues stemming from her knee surgery. *See id.* at 287. Thus, the ALJ's conclusion that Plaintiff can perform sedentary work and can occasionally perform all posturals is supported by the record.

Finally, the Court agrees with the ALJ's determination that Plaintiff is capable of performing her past job as an insurance clerk. At the disability hearing, the VE testified, based on her experience as a career counselor and career services coordinator, that an insurance clerk is a semiskilled job performed at the sedentary exertion level, which requires only occasional posturals. *See id.* at 63-64, 235-36. That job, as the ALJ noted, accommodated the limitations of someone with Plaintiff's RFC. *See id.* at 63. Thus, the Court agrees with the ALJ's conclusion that Plaintiff's past relevant work accommodated her RFC.

Accordingly, the Court finds that the ALJ's disability determination was based on the correct application of the law and is supported by substantial evidence.

### 6. New Evidence

Upon judicial review of a denial of social security benefits, a district court may remand a case to the Commissioner to consider additional evidence that was not included as part of the original administrative proceedings. *See* 42 U.S.C. § 405(g). This type of remand is only appropriate if a plaintiff can show that the evidence is (1) new and not cumulative of what is already in the record; (2) material in that it is relevant to the claimant's condition during the time period for which benefits were denied and there is a reasonable possibility that the new evidence

would have influenced the Commissioner to decide the disability determination differently; and (3) good cause has been shown for failing to present the evidence earlier. *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991) (internal citations omitted).

Plaintiff submitted additional medical records to the Appeals Council, which the Appeals Council did not consider because (1) they were cumulative or (2) Plaintiff had not shown "a reasonable probability that it would change the outcome of the decision." *See* R. at 6. As a primary matter, the Court agrees that some of the "new" records were already in the record, and thus, were considered by the ALJ. *See id.* at 430-32. However, Plaintiff has presented two new pieces of evidence, which, Plaintiff argues, "indicate the claimant has difficulty *balancing*." *See* Dkt. No. 11 at 9 (emphasis in original).

The first piece of new evidence is a patient visit note from Dr. Leonard Goldstock, dated January 21, 2013, which indicates that Plaintiff has a permanent fifty percent impairment in her right fourth finger. *See* R. at 14-15. That report was issued before the alleged disability onset date, and Plaintiff has not submitted any other medical records that show a severe or worsening issue stemming from the limited use of Plaintiff's finger. The second piece of new evidence is a medical report from Dr. Lawrence dated November 14, 2017. *See id.* at 21. That report does not present any new findings because it shows that Plaintiff's severe scoliosis was not worsening, and thus, is completely consistent with the other medical records. *See id.* (reporting that Dr. Lawrence did "not see any significant change" and that Plaintiff was "doing well" and did not appear to need surgery). Although Dr. Lawrence reported that Plaintiff has "difficultly with standing posture and balance," he also reported that Plaintiff's condition "has not progressively worsened" and "[s]he has no symptoms down the legs at all, which is good." *See id.* Thus, this "new evidence" does not reveal an impairment that is substantially more severe than anything

previously diagnosed, and there is not a "reasonable possibility that the new evidence would have influenced the Commissioner to decide the disability determination differently." *See Lisa*, 940 F.2d at 43.

Accordingly, the new medical records do not require remand.

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that the Commissioner's decision denying disability insurance benefits is **AFFIRMED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the Commissioner's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 17, 2019
      Albany, New York

```
Mae A. D'Agostino
U.S. District Judge
```